Good morning. Good morning, Your Honor. All right. All the king's horses and all the king's men cannot put a discharged jury back together again. That should be the rule in this case. Our proposal is that the court adopt a bright line rule that says once a jury panel is formally discharged, whether they leave the courtroom or whether they stay in the courtroom, they are discharged. Defendant's supplemental brief makes the rationale for such a rule very clear. As the defendant points out, the judge... Before we get there, I have a number of questions for you. I'm trying to figure out what happened below. And based on my review of the record, it seems like there was a problem with the jury instructions in that it never really clearly told the jury or the verdict for that matter, neither stated that the jury had to award at least $10,000, $10,136. I'm perplexed by that. I mean, you all get to offer the jury instructions. I know the judge plays an important role in that. But why was the jury not clearly told in the instructions or the verdict form? And then based on the question that they asked and ultimately the verdict that they gave the first time around, I think they probably did assess the amount of money that they thought your client deserved. The question as to what happened below still perplexes me. Well, you were there, and I'm wondering if you had an obligation and co-counsel here to make that clear. And why haven't you waived that if you didn't make clear for the jury in the first instance what they needed to do? I'm wondering why we just don't reinstate that first verdict. I did everything I could, including filing a motion for summary judgment. Actually, though, everything you could would have been to include language in the instructions and the verdict form saying, jury, we have stipulated that you have to at least award $10,000, $10,136, and your duty here is to assess whether any amount in addition to that, and please put it right here. I'm just perplexed why that didn't happen. I twice moved the court to grant judgment on the special damages, and I was twice denied. The court made clear that it was going to allow the jury to do whatever it wanted. Off the record, the court agreed with exactly your analysis in hindsight. Oh, I should have given them an instruction that said the amount of damages that were ---- Well, but did your instruction that you proposed include that? I didn't propose an instruction because I moved for summary judgment and I moved for a directed verdict, and they were both denied. He said this is an issue, a fact for the jury to decide. The court was not consistent in its rulings, and the court should not have allowed the jury to decide the amount of special damages. The court should have instructed the jury on those. But even though I moved for summary judgment, the other side would say, well, there's a dispute. Then at trial, they say, well, we still dispute it. I mean, even in briefing, they still kind of want to keep the door open for a jury to give the lowest number possible. The lowest number is above 30,000. That's the undisputed medicals. The 10,100 ---- Why wasn't this clearly explained for the jury? The court made a couple of errors when I asked them to do this. Did you submit an instruction along the lines that Judge Murguia suggests? No, because my motions were denied. Well, but the motions ---- a motion summary judgment can be denied, and to preserve the record, you make a motion for a directed verdict. I did. And then to preserve the record further when it's denied, you submit an instruction. And when that's denied, you have an appealable issue. The issue is if you haven't submitted an instruction, haven't you waived the issue? No. I think that by moving ---- That's how the jury is concerned. I think by moving for a summary judgment and moving for a directed verdict and getting the parties to both collectively tell this jury exactly what you proposed, you must award more than this amount. They weren't listening. They were so upset at a client that would lie to them. Not that you must award more than this amount, but apparently you all had agreed that at least $10,136 was agreed upon or stipulated to in terms of the minimal amount of damage owed. And then the jury, from what I can read here, was that the jury was to determine when, if any, additional money besides that was to be given to the plaintiff. And there's nowhere where that's clear. And I'm not quite sure how you all haven't waived, you know, by not making that clear. The court would not instruct the jury. It would not find that special damages were undisputed. It said twice to us that the special damages are disputed. Off the record, of course, it would say, well, they're not really disputed, so you both need to tell the jury, which is what happened off the record and what we did. That's as far as the court would allow it to go. Let's move on and let me ask you, did you poll the jury before they were re-enpaneled for the second go-around? I do not recall polling the jury after the first hearing. Did you ask to poll the jury? I don't recall. The record would reflect that. It shows that you didn't. So I'm trying to figure out why that doesn't amount to a waiver. Failing to poll the jury, waiving. I'm trying to ask to poll the jury because right now you're arguing, it appears from your first statement here of all the king's horses and all the king's men, that you're trying to say that we need to adopt the Bright Line rule. And I'm just trying to figure out if you're challenging that that jury was improperly re-enpaneled or re-sent back after they were discharged, did you do everything possible to show that they were somehow tainted? You didn't poll the jury. You didn't ask to poll the jury, did you? I think they were unanimous. I would stipulate without even knowing. I'm sure they were unanimous. I was there and the question is that when they went out and then were reassembled, the court did ask, have any of you discussed this and so on, and it was a group answer. There was no individual polling of each member of the jury to find out, get each of them to confirm the collective answer. You're saying as to the discussions. I mean, we know, and it's a matter of record, that there were smaller discussions after they were discharged and they left the courtroom. We know one juror left the courthouse. What was discussed, and if you're talking about polling in that instance, that was not done. And the court did not give the attorneys an opportunity to talk. Did you ask? I did not ask to find out the degree to which they, when they were no longer secure, the degree to which they might have looked on their phone. That they were allowed to mingle. And leave. No, because I saw firsthand that it happened. Well, but it's all about preserving for the record, and so I'm just curious as the judge was asking the jury questions, and now we have to determine whether did they mingle too much or not in order to determine what to do here and either impose the bright line rule or to do this totality of the circumstances test. I'm just wondering, you know, whether or not you did enough in asking questions to, of the jurors to see if whether or not they were tainted by mingling. Well, and it's our position by being discharged they are tainted. As a matter of fact, that nothing can occur and they're still tainted. They cannot be re-empaneled once they've been discharged. The court did ask us whether its decision to re-empanel the jury and bring them back in, you know, whether we had objections. And I objected on the record. Absolutely, I object. There's no way to do this. But you didn't ask the judge, can I inquire of the jurors? Who did you talk to? What did you say? Anything like that. Because we're going to have to look right now and see what's the best way to proceed at this point, either to say no, this has to be tried again because they were going to impose the bright line rule, or we're going to maybe apply the totality of the circumstances, or you all waived this and you're going to have to live with the zero verdict. Mr. Angel, let me ask you a question of the law. Sure. Okay. There's no Ninth Circuit court case which holds that once the magic word, you're discharged, is uttered by the judge, the jury is no longer a jury. True? That's true. We do have some law from the Eighth Circuit saying precisely that, and some law from the second, I think the third, fourth, and some other circuits saying, oh, no, we have to adopt Summers, which is a 1926 case out of the South, right? Yes. Why should we, what is the policy reason, what is the rationale for saying that once the magic words, you're discharged, is uttered by the judge, the jury doesn't exist anymore? Because all during the trial, jury dispersal occurs every day at the end of the day. If there's an earthquake or a thunderbolt or a bad storm, they might run out of the courthouse. The jury is dispersed. There are opportunities for tainting the jury in those opportunities. Why shouldn't we take a practical outlook and say, just as a jury is dispersed every day after work, the jury is dispersed after discharge. The issue is, was there any jury misconduct? Was there any tainting proved? And whether it happens after the words discharge happens or it happens during the trial, the test is the same. And I think that question goes to your question. I think it's the same thing. When you are discharged at the end of a trial, what happens is different than when you're discharged at the end of the day. You're told you are no longer admonished not to discuss this amongst yourselves in smaller groups. You're no longer admonished not to talk to other people. You can go on your phones. I would be interested, was there any evidence that the jurors, when they were talking to the clerk after being discharged, talked about the case? Was there any evidence that the jurors, consisting of a rump jury of five jurors, not seven juries, talked about the case? There was no evidence. And what's more, you didn't voir dire any of the jurors to find out if they had talked about it. And the reason, I think the reason, and this goes to your answer. You don't want the answer. No, the problem is, that's a question no one can answer. It's like asking my four-year-old if something just happened today that's going to make her and the two-year-old get in a fight tomorrow. She doesn't have the funded knowledge. She doesn't know what that deliberation is going to be. No, no, no, no. Well, you don't know. It's not like asking a four-year-old. I respectfully just, it can't be like asking a four-year-old. I'm just, let me rephrase this and see if you can answer this. You know, shouldn't you have the burden to prove that the jury was prejudiced? No. Okay. No, and the reason why, if you ask somebody. Let's say you did have the burden, okay?  Sure. Did you meet this burden? The verdict. To show that the jury, the second jury, I mean the jury after it was discharged and came back, to show that they were somehow prejudiced or tainted and couldn't proceed with the process. Did you meet the burden of showing that they were? I think that in my issue number two, which really got past the verdicts and talked about the mistrial, absolutely there's a showing that they did not follow the evidence, even in the second verdict. It's not, it does not equate to as much as the special damages. It's not about following the evidence. Right now we're talking about whether or not, because the way I understand your appeal is you're saying that you should not have proceeded with that same jury for the second go-around of deliberations. Is that correct? Correct. All right. So why not? What was wrong with that jury? They had heard all of the evidence. The main issue is that they were discharged. We're trying to figure out whether or not that discharge in and of itself, just because they were discharged, was enough to say that they could not regroup and further deliberate and proceed as they did here. And my answer is the Summers rule is unworkable. It is unworkable to ask somebody, if you saw or heard any reactions from the parties, anything in the courtroom, anything out of the courtroom, anything on your cell phone that's going to affect the way you guys talk about this case tomorrow. Well, they don't know what the other people are going to say to them. They don't know the conversation. They only know one-twelfth of it. And so it's not fair for them to have to think, am I going to want to bring up anything I just heard or said tomorrow when the 12 is still talking? Counsel, you're getting to the answers. The question is, then, as the judge posed, he said, I'm going to ask any of you, did anything occur during the few minutes after you were discharged when you talked to anybody about the case outside your immediate numbers? Jury panel, no, sir, no. Did we get everybody stopped in time for that not to occur? Heads nod. Uh-huh. Yes. Juror, I didn't. You did. Most of us were just outside the door here, and there was only two that went down to the, that's what I tried to do. I understand one juror had gone to the first floor, and it was maybe to get a hotel receipt. Juror, I did that, but I didn't talk to anybody. You didn't talk to anyone. So in terms of you being contaminated by any outside information, that is not a factor. No, juror. Jury panel, no. Okay. So that was an en masse, except for the one who volunteered, polling, if you will. Correct. Are you suggesting that if the judge had then gone through and individually repeated those questions to make sure, or you had asked those questions, if all they said was, yes, I did talk to somebody, I talked to my family, I talked on my cell phone, that's, I mean, that would, without regard to the answer, then that would trigger perhaps the concerns of the Eighth Circuit. Well, what we have. The problem we have here is the Eighth Circuit, and you picked up on it, and the defendants themselves are saying, well, you know, with the modern technology, there's all sorts of ways to communicate. And under the Eighth Circuit rule, if they, I think they say, once you leave the courtroom, go out that door, then that's it, as long as you stay in the courtroom. Right. And this is taking the Summers rule to a point where even the Eighth Circuit was like saying that it might have been taken a little too far, where people are actually outside the courtroom, outside the building, which we had here. And we didn't inquire of them every single thing, you know, go through and interrogate each juror and ask them what was the discussion, as you remember it. We know they had a discussion in smaller groups. It was observed. I put that on the record. And there was no meaningful tool that we had to re-impanel that jury. There's no way to rebuild the egg. Sure you could. You could do the same voideer as you did when you impaneled them to begin with. You could put them in a jury box, swear them in, and say, tell the truth about what the content of your conversation was. But before the jury trial, they do not have any access to the parties or their witnesses or anything that happens outside of the trial. We're talking about whether the jury had been contaminated. You had an opportunity to voideer them by putting them back in the jury box, just like the judge did. The judge did a pretty thorough job of voideering. Could have asked a couple more questions. Could have asked them, did you talk about this case amongst yourselves in less than seven in number, right? And he didn't ask that. You didn't ask it either. And I think the disconnect between, and I'll finish with this, I think the disconnect between the questions and what the Eighth Circuit did is the Eighth Circuit says there is no measure to decide how contaminated a jury is. Once they're no longer sequestered, it's over. That's their rule, and that's the rule I'm proposing today. I think to leave discretion in the court, they already have discretion to decide when they will call to have the jury disbanded. Once they've made that call, that should be the end of it, because there is no practical way to tell how pure the well is after the sequestration is ended. So the Eighth Circuit rule, I think, is appropriate, and it does help the parties in the courts with a bright line. Thank you. Justices? Counsel? Judges? We're judges. Judges? No justice here. My name is Jesse Beaudet. I represent Hilary Bold in this matter. Did you try the case? Yes, I did. Okay. The question before this court is what rule does this court want to adopt in this situation when a jury can or cannot be re-enpaneled after the court says the magic word of you're discharged? Now, as you're all aware, there's two kinds of lines of authority, the Summers rule, which looks at everything on a case-by-case basis, and the Eighth Circuit rule that just draws a bright line. Now, I think this court needs to look at it and decide what rule is best for the Ninth Circuit, and I think you need to take into consideration of what's going to work to prevent needless mistrials because district court judges don't want to retry cases again if they don't have to. And on the other end of it, you don't want a district court judge to recall a jury that's been influenced or tainted by some outside source. I need to ask you the same question I asked Mr. Angel, though. Why wasn't it more clear in the original instruction and verdict form what the jury was supposed to do? And so, I mean, it seems like the people at fault are the people here today. Yes, Your Honor, and I agree with you. I agree with you. In hindsight, I should have put in a jury instruction that says you have to award at least $10,136, plus something for pain and suffering. Why would you have to do that? They put in the evidence of a request for admission, which admitted that. Yes, and in my opening statement and my closing arguments, I admitted and told the jury, we admit Mr. Deese was injured. We admit he's got $10,136 in medical expenses. We admit those are owed and due to him. But I think as lawyers and judges, we forget the jury doesn't know everything that's going on, and they don't know what's going to happen after the return of the jury. And they asked a question reflecting some confusion regarding what they were supposed to do, and still no one clarified it. Well, the judge answered the question that they asked. They asked if the medical expenses had been paid, and if so, who paid them. They had been paid by my client's insurance company under Montana law, under the Ridley v. Guarantee National case. The court answered the question saying, it's not germane to your deliberations as to if they've been paid or who has paid them. But then after we gave that note back to the jury, the judge did speculate, I hope they're not thinking they can award less than that. And I didn't think they would think that because I had explained to them in closing that they had to award that. But I think the confusion came in part in that the medical bills submitted to the jury that went to the jury room were not medical bills from the medical provider. Counsel submitted health insurance claim forms. And so I think the jury had issues with whether those bills were paid and who paid them. And I don't think the jury wanted to double pay if they'd already been paid. And so the jury doesn't know, like we do, that when the verdict comes back, my client gets credit for what's already been paid on the verdict. And we didn't explain that to the jury. I thought my closing argument was good enough to explain it to the jury, but obviously it wasn't because they came back at zero. And under Montana law, the jury can't return a verdict underneath the admitted damages of $10,136. Let me ask you, if we adopt this case-specific approach, how can we apply it with this record? I mean, do we know that the jury was not tainted and was there sufficient inquiry? We do know that, Your Honor. If you look at, I think it's pages 258, 259, 260 of the record, the transcript, the district court, when he brought back the jury, talked to them to find out if any of them had been tainted. Now, he didn't go through and ask on an individual basis of each individual juror. He talked to the seven jurors as a whole. But he got collective answers from the jury that none of them had talked to any outside sources and none of them had discussed the case with anybody. But it was a little unclear because two jurors, it looks like the bulk of them were right around the courtroom, but two of them had gone off and one of them had actually talked to the clerk. And there was some question of whether another one had actually even left the building. It was never clarified. It is not clarified, Your Honor. I agree with you. The issue, though, with regard to talking to the clerk, if you look at the transcript, and I think it's around page 248 to 249, Mr. Angel says, well, I saw somebody talking, one of the jurors talking to the clerk. And the judge on that same page asks him about that. And he says, well, I think that's what I saw. So it's not real clear if a juror did talk to the clerk at that point or not. And with regard to the jurors going outside or going downstairs, on page, I think it's 260 or 261, the judge talks to that juror, and he said, I heard something about someone going down to the first floor, and the juror says, yeah, that was me. I didn't talk to anybody. So he didn't specifically ask him if he had left the building or not, but he did ask that specific juror if he had talked to anybody, and that juror said no. And so as the record stands, we don't have any evidence at all that this jury was influenced by an outside source from the time the judge discharged them until he recalled them. But even in Summers, it says that, I mean, it seems to stand for the proposition that a jury cannot be recalled if the jurors had even an opportunity to mingle. And here, didn't they have an opportunity to mingle? I mean, would this even comply with what happened here with Summers? I don't think this would comply with Summers. I think Summers is actually narrower than what the case law is now, the line of authority that they call the Summers rule. The more recent decisions out of the state Supreme Courts that I cite in my brief, they're situations where they talk about the jurors left the courtroom, but they're still within the courthouse. Now, obviously, the jurors are going to have the opportunity to mingle with people inside the courtroom and outside the courtroom. One important fact here, I think, is whatever rule this court comes up with, it's going to apply to every federal courthouse in the Ninth Circuit. We know that. And that can vary considerably from the large cities to the small towns. In Butte, Montana, those jurors have a much better chance of intermingling with somebody in that courtroom than they do outside in the halls. There's nobody in the courthouse in Butte, Montana. You have to go through security to get there. The only people that are there are on business there, and the court personnel that are there are usually in secure areas. So I don't like the Bright Line rule for the fact that just because you walk out that door means you're prejudiced. It doesn't. Well, I've noted that in your brief. You said individual jurors, the supplemental brief, individual jurors may turn on cell phones, make calls, look at e-mails, send and receive text messages, or look at the Internet while still in the courtroom. And my comment on that was that's what the defendant is arguing. And you're saying, well, there's no magic line out which side, you know, the courtroom door, that door over there, doesn't block it. So that's why he's arguing, as I understand it, for once discharged, regardless of where they are, it's done. You can't do anything in going into inquiries about contamination and the like. So I don't understand your point. Well, my point is that assuming that the jury gets contaminated as soon as they walk out the courtroom door, assume something that shouldn't be assumed. I mean, there's nothing magical to say that as soon as a juror walks out that door they're going to do something to turn on a cell phone or talk to somebody that they can't do inside the courtroom. Right. So why doesn't that argue for his rule is once the magic words are said, regardless of if they go outside the courtroom, they're done. You can't reassemble them. Because I think you need to look at the facts of each case. I don't think it's a good idea to draw a rule where as soon as the gavel drops and the judge says you're discharged to draw the line right there, because in each case the jury may have no opportunity and no ability to interact with anybody. And in those situations I don't think this court should draw a bright line rule and say you have to retry that case unless there's a reason to do it. Okay. So we've talked about polling or voir dire before they're re-impaneled. What kind of questions would you say would be appropriate? To the jury? Yeah. Asking them what they had done. Where were you from the time you were discharged until now? Where did you go? Who did you talk to? Do you have a cell phone? Did you communicate with anybody on your cell phone?  Did you talk to any court staff? Did you talk to anybody in the audience? Was there anybody in the hallway when you walked out in the hallway? Was there anything that happened in the interim? The answers are yes. If the answers to any of those questions are yes, then the judge has prejudice to the content. I believe so, yes. To find out if something has prejudiced this jury or subjected them to any sort of outside influence. Okay. So coming back to this case under your approach, where did that happen? On pages 258, 259, and 260 of the record, where the judge talked to them as a collective whole, and he asked them. You'll agree that it was not as searching as what you just proposed right now. I do agree with that. It was not as searching as what I just said right now. And shouldn't it have been? And does that affect which way we go here? I don't know if it needs to be that specific, because the judge asked them if they had been subjected to any outside influences, talked to anybody, and they all said no, they had not. He didn't ask that. He accepted from his inquiry as to whether he talked to anyone, whether he talked to anyone other than yourselves, right? So he never asked the question, did five of you discuss the case? Correct. He did not. Now let me ask you another question, Mr. Beaudet. This all happened on one day within a few minutes of the discharge. Correct. If we adopt a Summers-type rule, would it make any difference if the jury were dispersed, went home, and were called back a week later? I think it would, yes, Your Honor. Why? Because in that point – Wouldn't the burden on the plaintiff be the same to show there's been contamination? Well, I think once they leave the courthouse and they're gone for a week, for the appearance of justice, you can assume they've talked to other people and that they may have discussed the case. And I don't think it's a good idea to draw a rule that lets them go home and call them back a week later. As some of the case law talks about, it's not only has the jury been subjected to outside influences, but protecting the image of the judiciary that that jury has, in fact, remained pure and free from outside influences. Yeah, they go home at the end of each day during trial, but they are at that point admonished, don't talk to anybody, don't discuss the case with anybody. Once they're discharged and they go home, I don't think you can call them back a week later because that admonishment is not there. And it would naturally be expected for them to talk to their spouses and family about what they've been doing for the last week. I think it could be expected, yes. Okay. So my argument is that this Court should adopt a case-by-case analysis rule that takes into consideration of, you know, was the jury still under the control or de facto control of the Court, and was the jury subjected to any outside influences, and apply that rule to this case. I don't think bright-line rules are good ideas because there will arise situations where retrial is mandated, but it's not necessary. Now, we've also got a couple other issues before the Court, such as the violation of the motions in limine and the issue about deciding the denied motion for summary judgment. Do any of you judges have any questions on those issues that I can answer for you? That's a collective question. So do you want to poll us? I do not. With that, Your Honors, that's all the time I need. Thank you very much. Thank you. You ran over your time, but we'll give you another minute. And if I may briefly, an unwritten rule that puts the onus on the plaintiff to come up with every concoctable question and get an admission of some sort of influence, otherwise they're going to have the same jury re-impaneled, a jury that reached an unlawful verdict, and re-deliberate is unworkable. Even if such a rule existed, though. It's not to get an admission, it's just to get the truth. It's just questions to determine whether they talked and if they talked to anybody or were influenced improperly. Right. And what we have on the record here that I introduced on the record is that the jury disbanded. They left the courtroom. So under the Eighth Circuit rule, new trial. Under the Summers rule, as it historically has been applied, retrial. What I put on the record is that they were collectively, in a smaller group, talking to the clerk. Not that I wasn't sure. I was sure. What the court asked me is, are you telling me they had an improper discussion? And I said, I don't know what they talked about. I'm just telling you. There was a small group of them talking to the clerk. And we know one of them left the courthouse. If the burden were on me to prove not just contamination, but the appearance of that, certainly we met the burden. They did disband. They did talk in smaller groups. They did have an unlawful verdict. So clearly there's prejudice already, or there's no explanation for a zero-dollar verdict. So what occurred under any of the rules is a void verdict, and it should be reversed. Thank you very much. All right, the case of Dietz v. Bolden will be submitted.
judges: Fisher, Bea, Murguia